**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| FREDERICK ALEXANDER, M.D., and PEDIATRIC SURGICALCARE, LLC, *Plaintiffs*, v. HACKENSACK MERIDIAN HEALTH, *et al.* *Defendants*, | Civil Action No. 19-18287 **OPINION** |

**John Michael Vazquez, U.S.D.J.**

This case arises out of Defendant Hackensack Meridian Health's ("HMH")[1] and Defendant Hackensack Meridian Health Palisades Medical Center Foundation's ("PMC" and together with HMH, the "Hospitals")[2] termination of Plaintiff Dr. Frederick Alexander's clinical privileges at their facilities.  D.E. 4 ("FAC").  Plaintiffs allege, among other things, that the Hospitals terminated Dr. Alexander's privileges in furtherance of a conspiracy to restrain Dr. Alexander's competition with another group of physicians.  Pending before the Court is Defendants' motion to dismiss Plaintiffs' FAC pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  Defendants do not challenge the sufficiency of the allegations as to the anticompetitive conduct.

---

[1] Plaintiff pleads HMH as "Hackensack Meridian Health a/k/a HMH Hospitals Corporation a/k/a Hackensack University Medical Center."  For purposes of this Opinion, reference to HMH shall refer to each of Hackensack Meridian Health, HMH Hospitals Corporation, and Hackensack University Medical Center.

[2] Plaintiff pleads PMC as "Hackensack Meridian Health Palisades Medical Center Foundation a/k/a Palisades Medical Center."  For purposes of this Opinion, reference to PMC shall refer to each of Hackensack Meridian Health Palisades Medical Center Foundation and Palisades Medical Center.

The Court reviewed the parties' submissions in support and in opposition[3] and decided the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b).  For the reasons stated below, Defendants' motion to dismiss is granted in part and denied part.

## I.      BACKGROUND

### A. Introduction

Dr. Alexander is a board-certified pediatric surgeon who was the Chief of Pediatric Surgery at HMH from 2007 to 2011.  FAC ¶ A.  Dr. Alexander voluntarily resigned from that position in June 2011 to pursue private practice.  *Id*. ¶ 65.  Dr. Alexander conducts business through Plaintiff Pediatric Surgicalcare, LLC.  Dr. Alexander maintained clinical privileges at HMH until June 9, 2017, when HMH suspended them.  *Id*.  PMC, in turn, suspended Dr. Alexander's clinical privileges on January 25, 2019.  *Id*.

Plaintiffs claim that the Hospitals improperly suspended Dr. Alexander's clinical privileges to eliminate his competition with pediatricians from New York University Langone Medical Center (the "NYU Group"), who HMH began collaborating with in 2012 after Dr. Alexander left.  *See id*. ¶ 413.  Plaintiffs allege that the process HMH used to suspend and ultimately terminate Dr. Alexander violated the "Constitution and Bylaws of the Medical and Dental Staff of HUMC" (the "Bylaws").  *See id*. ¶ A.

Starting in January 2015 and continuing through September 2016, HMH allegedly subjected Dr. Alexander to a baseless and retaliatory peer review.  Specifically, Defendant Medical Executive Committee Of Hackensack University Medical Center (the "MEC")[4] charged Dr.

---

[3] Defendant's brief will be referred to as "Def. Br." D.E. 8; Plaintiffs' opposition will be referred to as "Pl. Opp." D.E. 11; and Defendants' reply will be referred to as "Def. Reply" D.E. 12.

[4] The MEC is a disciplinary body of individuals empowered to investigate concerns regarding clinical competence, patient care, and violations of medical center rules.  *Id*. ¶¶ 34-35.  The MEC

Alexander with "misuse" of HMH's ER and subjected him to a peer review (the "ER Peer Review") by other physicians at HMH. *Id*. ¶¶ 102-03. Plaintiffs allege that the MEC's decision to conduct the ER Peer Review "in-house" instead of retaining an outside clinician was improper. *Id*. ¶ 103. Based on the findings of the ER Peer Review, the MEC appointed a committee (the "Baker Committee") to investigate the charge that Dr. Alexander had misused HMH's ER. *Id*. ¶ 107. After its investigation, the Baker Committee issued a report stating that it did not find "any clear or demonstrable deviation from an ethical manner of practicing, or of not putting the patient's interest first." *Id*. ¶¶ 108, 109. As a result, on September 27, 2016, the MEC decided not to revoke Dr. Alexander's clinical privileges, but allegedly did order a secret professional performance evaluation ("FPPE"). *Id*. ¶ 110. Plaintiffs claim that the MEC did not inform Dr. Alexander of the Barker Committee's findings or about the FPPE to keep Dr. Alexander "uninformed" and "vulnerable." *Id*. ¶ 113.

While the Baker Committee's investigation was underway, Plaintiffs claim that HMH was simultaneously manipulating HMH's ER call roster and internal referral system to stifle Dr. Alexander's business. *Id*. ¶ 75. Plaintiffs allege that HMH removed Dr. Alexander from the ER call roster and placed him and another independent pediatric surgeon on a "secondary sham on-call schedule" even though the NYU Group did not have enough members to cover the call schedule. *Id*. ¶ 76-78. HMH also transferred patients to the NYU Group without notifying Dr. Alexander and without regard to patient preferences. *Id*. ¶¶ 81, 85. According to Plaintiffs, members of the NYU Group also pressured sub-specialist doctors at HMH to refer patients to the NYU Group and not to Dr. Alexander. *Id*. ¶ 89. The MEC ultimately reinstated Dr. Alexander to

---

is also empowered to make staff privilege recommendations at HMH and to take corrective actions. *Id*. ¶ 36.

the ER call schedule after determining that the manipulation of the on-call system was "unfair." *Id*. ¶ 79.

### B. The Suspension and Termination Proceedings

On June 9, 2017, Defendant Dr. Martin Karpeh told Dr. Alexander that HMH had summarily suspended Dr. Alexander's clinical privileges. *Id*. ¶ 118. A letter informed Dr. Alexander that HMH based the suspension on "safety issues" related to his care of three patients (the "Original Cases"). *Id*. ¶ 119. Pursuant to the Bylaws, Dr. Alexander requested a hearing before the Defendant Ad Hoc Committee Hearing Panel at Hackensack University Medical Center ("AHC"). *Id*. ¶ 120. The AHC consisted of three physicians from the MEC that reviewed the MEC's summary suspension of Dr. Alexander. *Id*. ¶ 40.

The AHC conducted a hearing on June 13, 2017 (the "AHC Hearing"). *Id*. ¶ 124. Plaintiffs allege several improprieties as to the AHC Hearing. First, the MEC failed to provide a specific rationale for Dr. Alexander's suspension. *Id*. ¶ 122. Second, the AHC permitted the MEC to produce the relevant medical records for the first time on the day of the hearing, thus depriving Dr. Alexander of the opportunity to review the records to prepare. *Id*. ¶ 124. Third, the AHC permitted the hearing to go forward even though the Bylaws obligated the MEC to first investigate the alleged conduct, which was not done. *Id*. ¶ 134. Fourth, the AHC improperly failed to issue a report memorializing its final decision. *Id*. ¶ 136.

Plaintiffs further claim that witnesses at the AHC Hearing were either unqualified or biased. Plaintiffs allege that even though Defendant Dr. Keith Kuenzler did not review the medical records of the "Original Cases" before the suspension was imposed, the AHC still permitted Dr. Kuenzler to testify as an expert witness against Dr. Alexander at the hearing. *Id*. ¶ 129. Plaintiffs

add that the AHC should not have permitted Dr. Kuenzler to testify because he directly competed with Dr. Alexander for patients.  *Id.* ¶ 128.

The AHC decided to uphold Dr. Alexander's summary suspension.  *Id.* ¶ 136.  In light of the AHC's decision, the MEC met on June 21, 2017 (the "June MEC Meeting") to consider further action against Dr. Alexander.  The MEC did not permit Dr. Alexander or his counsel to appear or present evidence at the meeting, but allegedly took new testimony from another physician at HMH who did not testify before the AHC.  *Id.* ¶ 143-46.  Plaintiffs allege that this new evidence falsely indicated that the "Patient Safety Committee" had reviewed the Original Cases.  *Id.* ¶ 147.  Based on the AHC's decision and the new evidence presented at the June MEC Meeting, the MEC recommended that Dr. Alexander's medical staff appointment and clinical privileges be revoked at HMH.  *Id.* ¶ 158.  Following the MEC's recommendation, HMH submitted a Health Care Professional Responsibility and Reporting Enhancement Act report to the New Jersey Division of Consumer affairs.  *Id.* ¶ 159.  According to Plaintiffs, the report falsely indicated that Dr. Alexander's clinical privileges had been revoked due to "incompetency which relates adversely to patient care or safety" and "professional misconduct which relates adversely to patient care or safety."  *Id.*  HMH made a similar report to the National Practitioner Data Bank.  *Id.* ¶ 160.

Pursuant to Article IX of the Bylaws, Dr. Alexander appealed the AHC's determination on June 27, 2020.  *Id.* ¶ 162.  The hearing started on October 9, 2017 and ended on July 12, 2018 (the "Article IX Hearing") and was held on fourteen separate evenings.  *Id.* ¶ 171.  Defendant Article IX Hearing Panel At Hackensack University Medical Center (the "Hearing Panel") presided over the matter.  The Hearing Panel was composed of three unidentified physicians and one attorney, Defendant Richard J. Webb, Esq.  *Id.* ¶ 45.  Under the Bylaws, the Hearing Panel had the power to review the MEC's adverse recommendations.  *Id.* ¶ 46.

As with the AHC Hearing and the June MEC Meeting, Plaintiffs allege numerous deficiencies with the Article IX Hearing.  Plaintiffs first take issue with the Hearing Panel's decision not to dismiss 23 "new" cases (the "Added Cases") of alleged misconduct that the MEC advanced in support of the AHC's decision to suspend Dr. Alexander's privileges.  *Id*. ¶ 164.  The Added Cases occurred before the AHC rendered its recommendation yet were not presented during the AHC Hearing.  *Id*. ¶ 165.  In addition, 15 of the Added Cases either occurred before the MEC assembled the Baker Committee or were formally investigated by the Baker Committee.  *Id*. ¶ 166.  The Hearing Panel denied Dr. Alexander's motions to dismiss the Added Cases.  *Id*. ¶ 175.

Plaintiffs also allege that the Hearing Panel issued several incorrect procedural decisions – on the advice of Webb – that rendered the Article IX Hearing unfair.  *See id*. ¶¶ 176-205.  Plaintiffs claim that the Hearing Panel improperly (1) precluded Dr. Alexander from presenting certain expert testimony, *id*. ¶ 177; (2) limited Dr. Alexander to one live expert witness for the Original Cases and prohibited Dr. Alexander from presenting live expert testimony on the Added Cases while the MEC was permitted to present live expert testimony on all the Added Cases, *id*. ¶ 178; (3) barred written expert witness reports, *id*. ¶ 182; (4) limited Dr. Alexander's witnesses, while similar limitations were not placed on the MEC, *id*. ¶ 183; (5) permitted non-pediatric surgeons to present expert testimony on pediatric surgery cases, *id*. ¶¶ 184, 208; (6) limited Dr. Alexander's counsel to written cross-examination questions for certain witnesses and altered Dr. Alexander's counsel's proposed written questions, *id*. ¶¶ 185-86; (7) prohibited Dr. Alexander from interviewing potentially relevant witnesses, *id*. ¶¶ 188-89; (8) ordered the sequestration of Dr. Alexander's witnesses while the MEC's witnesses were not sequestered, *id*. ¶ 195; (9) permitted the MEC to violate scheduling orders, *id*. ¶ 196; and (10) permitted the MEC to disclose and produce documentary and testimonial evidence on a delayed basis, *id*. ¶ 196.

The Hearing Panel concluded that the MEC had established a sufficient basis, by a preponderance of the evidence, to suspend and terminate Dr. Alexander's clinical privileges at HMH.  *Id*. ¶ 232.  As a result, on January 8, 2019, Defendant Executive Committee of the Board of Governors of HMH (the "Executive Committee")[5] acted to finally revoke Dr. Alexander's privileges and appointment to the medical staff at HMH.  *Id*.  Pursuant to PMC's bylaws, on January 25, 2019, Dr. Alexander's clinical privileges were also revoked at PMC because of the Executive Committee's revocation determination.  *Id*. ¶ A.

On February 4, 2019, Dr. Alexander appealed the Hearing Panel's decision.  *Id*. ¶ 236.  The panel (the "Appellate Panel") appointed to review the Hearing Panel's decision unanimously rejected and reversed the Hearing Panel's decision.  *Id*. ¶ 241.  The Appellate Panel found that the MEC failed to engage in collegial intervention in the first instance, as required by the Bylaws.  *Id*. ¶ 243.  In addition, the Appellate Panel determined that the Hearing Panel's decision to permit the MEC to prosecute the Added Cases at the Article IX Hearing without first presenting those cases at the AHC Hearing violated Dr. Alexander's due process rights.  *Id*. ¶ 249-51.  The Appellate Panel also concluded that there was insufficient evidence to support the Hearing Panel's recommendation to revoke Dr. Alexander's clinical privileges.  *Id*. ¶ 257.

Despite the Appellate Panel's decision, the Executive Committee referred new charges that Dr. Alexander falsified medical records (the "Falsification Charges") to the MEC for consideration.  *Id*. ¶ 262.  The MEC, in turn, retained Dr. Jonathan Burroughs to investigate and evaluate the Falsification Charges.  *Id*. ¶ 268.  The MEC did not permit Dr. Alexander to present evidence or make argument concerning the charges.  *Id*. ¶ 270.  Although Dr. Burroughs' findings

---

[5] The Bylaws empower the Executive Committee to act upon the recommendations of the MEC concerning suspensions and dismissals.  *Id*. ¶ 52.

were not provided to Dr. Alexander, Dr. Burroughs apparently determined that Dr. Alexander had falsified medical records. *Id*. ¶ 293.  Based on Dr. Burroughs' findings, the Executive Committee upheld the MEC's recommendation to revoke Dr. Alexander's clinical privileges and membership on the staff at HMH.  *Id*. ¶ 295.  HMH reported its revocation of Dr. Alexander's privileges to both the New Jersey Division of Consumer Affairs and the National Practitioner Data Bank, indicating that the revocation of privileges was due to "substandard or inadequate care" and "professional misconduct which relates adversely to patient care or safety."  *Id*. ¶ 300.

Plaintiffs claim that HMH's revocation of Dr. Alexander's privileges harmed Dr. Alexander's reputation and deprived him of access to the 17 hospitals that HMH owns, significantly damaging his business.  *Id*. ¶ 301.

## II.    PROCEDURAL HISTORY

Dr. Alexander filed his initial Complaint on September 24, 2019.  D.E. 1.  Plaintiffs then filed their FAC on October 25, 2019, adding Pediatric Surgicalcare as a Plaintiff.  D.E. 4.    The FAC alleges twelve causes of action: (1) restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) conspiracy to monopolize under Section 2 of the Sherman Act, 15 U.S.C. § 2; (3) unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125; (4) breach of contract under New Jersey law; (5) judicial review for fundamental fairness under New Jersey law; (6) violation of due process under New Jersey law; (7) intentional interference with prospective business advantage under New Jersey law; (8) defamation under New Jersey law; (9) restraint of trade under the New Jersey Antitrust Act, N.J.S.A. § 56:9-1, *et seq*.; (10) intentional infliction of emotional distress under New Jersey law; (11) violation of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1, *et seq*.; and, (12) trade libel under New Jersey law.  *Id*. ¶¶ 410-538.  On December 24, 2019, Defendants filed this motion to dismiss, D.E. 8, which Plaintiffs opposed on

January 17, 2020.  D.E. 11.  Defendants filed a reply in further support of their motion to dismiss on January 27, 2020.  D.E. 17.

### III.    STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]"  To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted).  As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims."  *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations."  *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).  If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim.  *DeFazio v. Leading Edge Recovery Sols.*, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

## IV.    ANALYSIS

Defendants raise three arguments in support of their motion to dismiss:  (1) claims against Defendants AHC, Hearing Panel, and Webb are subject to either the litigation privilege or quasi-judicial immunity; (2) Count Eight, for defamation, fails to state a claim; and (3) the trade libel claim is protected by statutory immunity.  Each will be discussed in turn.

### A.  Litigation Privilege and Related Arguments

Defendants Hearing Panel, AHC, and Webb move to dismiss the FAC based on the litigation privilege and quasi-judicial immunity.  Def. Br. at 11-15.  In addition to addressing Defendants' arguments, Plaintiffs point to applicable federal and state statutes.  The Court addresses Defendants' arguments first before turning to the statutory arguments raised by Plaintiff.

#### 1.  The Litigation Privilege

New Jersey's litigation privilege[6] applies "'to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.'" *Hawkins*, 141 N.J. at 207.  The litigation privilege ensures that "[s]tatements by attorneys, parties and their representatives made in the course of judicial or quasi-judicial proceedings are absolutely privileged and immune from liability."  *Peterson v. Ballard,* 292 N.J. Super. 575 (App. Div. 1996) (citing *Erickson v. Marsh & McLennan Co., Inc.,* 117 N.J. 539 (1990)).  The privilege is absolute and applies "even if the words are spoken maliciously, without any justification or excuse, and

---

[6] As to the litigation privilege, the parties agree that New Jersey law governs.  *See* Def Br. at 13 (citing *Hawkins v. Harris*, 141 N.J. 207 (1995); *see also* Pl. Opp at 17-18 (citing *Hawkins*, 141 N.J. at 207).  Accordingly, the Court will apply New Jersey law.  *See Manley Toys, Ltd. v. Toys R Us, Inc.*, No. 12-3072, 2013 WL 244737, at *2 (D.N.J. Jan. 22, 2013) ("Because the parties have argued the viability of the remaining claims as though New Jersey substantive law applies, the Court will assume that to be the case." (citing *USA Mach. Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir. 1999)).

from personal ill will or anger." *Williams v. Kenney*, 379 N.J. Super. 118, 134 (App. Div. 2005) (internal quotation marks omitted) (citing *DeVivo v. Ascher*, 228 N.J. Super. 453, 457 (App.Div.1988)).

For the first prong, Defendants argue that the litigation privilege applied during the AHC Hearing and the Article IX Hearing because they were "quasi-judicial" proceedings. Def. Br. at 14. The privilege "has expanded beyond strictly judicial proceedings" and encompasses "quasi-judicial" proceedings as well. *Zagami, LLC v. Cottrell*, 403 N.J. Super. 98, 105 (App. Div. 2008) (citing *Rainier's Dairies v. Raritan Val. Farms*, 19 N.J. 552, 559 (1955)). In *Zagami*, for example, the court applied the privilege to immunize statements made in connection with a municipal liquor license renewal proceeding. *Id*. at 111. However, the cases Defendants rely on for this point are inapposite. *Nanavati v. Burdette Tomlin Mem'l Hosp.* does not discuss the litigation privilege. *See* 107 N.J. 240, 249 (1987). Likewise, *Zoneraich v. Overlook Hosp.* did not mention the litigation privilege. *See* 212 N.J. Super. 83, 99 (App. Div. 1986). And the New Jersey Appellate Division's unpublished decision in *Gasperetti v. Deborah Heart & Lung Ctr.* only considered whether the litigation privilege immunized an attorney's statement in a report to New Jersey's Board of Medical Examiners pursuant to N.J.S.A. § 26:2H–12.2b(a)(3); it did not evaluate whether the privilege applied during the defendant hospital's internal hearing procedures. *See* No. A-0244-13T2, 2017 WL 5619212, at *10 (App. Div. Nov. 22, 2017).

Thus, Defendants have not carried their burden to demonstrate that the underlying proceedings were quasi-judicial in nature.[7] Yet, even assuming that the ACH Hearing and Article

---

[7] The Court notes Judge Chesler's decision in *Le v. University of Medicine and Dentistry* would seemingly support a finding in favor of Defendants. *See* No. 08–991 (SRC), 2009 WL 1209233 (D.N.J. May 4, 2009). In *Le*, Judge Chesler found that a medical university's disciplinary hearing (concerning allegations of the plaintiff cheating on an exam) was quasi-judicial in nature and that, as a result, the litigation privilege applied to the plaintiff's claims for false light and defamation

IX Hearing were "quasi-judicial," the Court finds that the litigation privilege is not applicable. The privilege "protects attorneys not only from defamation actions, but also from a host of other tort-related claims." *Loigman v. Township Committee of Tp. Of Middletown*, 185 N.J. 566 (2006) (concluding the litigation privilege applied to § 1983 claims); *see also Giles v. Phelan, Hallinan & Schmieg, L.L.P.*, 901 F. Supp.2d 509, 523 (D.N.J. 2012) ("New Jersey Courts have applied the litigation privilege to intentional and negligent infliction of emotion distress . . . material misrepresentation . . . and negligent misrepresentation, fraud, and malicious interference with prospective economic advantage" claims. (internal citations omitted)).

However, the Third Circuit has found that the litigation privilege does not immunize "conduct calculated to thwart the judicial process." *Williams v. BASF Catalysts LLC*, 765 F.3d 306 (3d Cir. 2014). In *Williams*, the Third Circuit held that the New Jersey Supreme Court would not extend the privilege to allegations that the defendants destroyed and fabricated evidence in connection with several asbestos-based products liability cases. *Id*. at 320. The Circuit reasoned that the plaintiff's complaint described conduct that impaired New Jersey's goals for the litigation privilege. *Id*. at 318. The *Williams* court stated that the purpose of the privilege is to "afford the parties 'an unqualified opportunity to explore the truth of a matter without fear of recrimination,'" whereas plaintiffs had alleged that the defendant lawyers and litigants actively frustrated the search for the truth and purposefully misled their adversaries. *Id*. The Circuit continued that the plaintiff's allegations were outside the core design of the litigation privilege – to protect "a witness, lawyer, or agent" who makes hurtful or defamatory remarks. *Id*. at 319. The court in *Williams*

---

arising out of the hearing. Following *Le*, the Court would be inclined to find that the ACH Hearing and Article IX Hearing were "quasi-judicial" such that the litigation privilege applied during those hearings. But Defendants did not cite to *Le*, so the Court does not rule on that basis. In any event, assuming that the litigation privilege was applicable, the Court would find that it does not reach the allegations here.

reasoned that "the [plaintiff's] allegations . . . describe[d] conduct calculated to thwart the judicial process" and were therefore more "akin" to non-privileged "malicious prosecution, perjury, and spoliation" actions. *Id.* The Third Circuit further noted that "the New Jersey Supreme Court has never immunized systematic fraud designed to prevent a fair proceeding." *Id.*

Here, accepting as true Plaintiffs' allegations concerning the AHC Hearing and Article IX Hearing (and the other related proceedings), Defendants' arguments fall short because Plaintiffs' claims "concern [Defendants'] conduct and not [Defendants'] statements." *Williams*, 765 F.3d at 319. Plaintiffs are not alleging that Defendants' statements made in the course of the proceedings harmed them; rather, Plaintiffs allege that Defendants rigged both the ACH Hearing and Article IX Hearing to deprive Dr. Alexander of a fair opportunity to adjudicate his suspension as part of a broader anticompetitive conspiracy to eliminate his privileges at the Hospitals. Among other things, Plaintiffs allege that the AHC permitted the MEC to produce the relevant medical records for the first time on the day of the AHC Hearing, FAC ¶ 124; the AHC improperly failed to issue a report memorializing its final decision, *id.* ¶ 136; Dr. Alexander was denied the opportunity to interview witnesses before the AHC Hearing and Article IX Hearing, *see id.* ¶ 187; Defendants unfairly leveled new charges of misconduct against Plaintiff Alexander just days before the Article IX Hearing, *id.* ¶ 164; the Hearing Panel and Webb improperly limited Dr. Alexander's ability to provide expert testimony, *id.* ¶ 178; the Hearing Panel and Webb unfairly barred Plaintiff Alexander's submission of written expert reports, *id.* ¶ 182; and that the Hearing Panel and Webb prevented Dr. Alexander's counsel from cross-examining witnesses, *id.* ¶ 185. Plaintiffs further allege that the Appellate Panel found that Dr. Alexander's due process rights were violated during both hearings and that there was insufficient evidence to terminate his privileges. *Id.* ¶ 241. Despite the Appellate Panel's finding, the Executive Committee still decided to revoke Dr.

Alexander's privileges at HMH, based on new charges levied after both the AHC Hearing and Article IX Hearing. *Id*. ¶ 295. In sum, Plaintiffs' claims are essentially that the AHC, Hearing Panel, and Webb "actively frustrated the search for truth" and that the Defendants conduct was "calculated to thwart the judicial process." *Williams*, 765 F.3d at 318-19. The litigation privilege does not reach such claims. *Id*. at 319. Defendants' motion to dismiss Plaintiffs' claims against the AHC, the Hearing Panel, and Webb based on the litigation privilege is denied.

### 2. Quasi-Judicial Immunity

Defendants also seek dismissal of Plaintiffs' claims against the AHC, the Hearing Panel, and Webb based on the doctrine of quasi-judicial immunity. Def. Br. 15-16. However, Defendants admit that "[i]n our research we have not encountered a decision in which claims have been asserted against the actual members of the hearing panel or its legal advisor." Def. Reply at 3-4. Indeed, although a few of the cases that Defendants cite discuss quasi-judicial immunity, none address the doctrine in the context of a private hospital's peer review hearings, as here.

Judicial immunity grants judges "absolute immunity from claims for damages arising out of the performance of their judicial duties." *Savadjian v. Caride*, No. CV 18-16381 (FLW), 2019 WL 6975102, at *2 (D.N.J. Dec. 20, 2019) (citing *Stump v. Sparkman,* 435 U.S. 349, 355-56 (1978)). "Absolute judicial immunity also extends to nonjudicial officers for claims relating to the exercise of judicial functions." *Id.* (citing *Butz v. Economou*, 438 U.S. 478, 512-13 (1978)). "Specifically, 'quasi-judicial' absolute immunity may extend to individuals tasked with performing functions that are judicial in nature, such as administrative law judges and agency hearing officers when performing adjudicative functions within executive agencies." *Id.*

Nearly all cases relied on by Defendants involved state actors. *Savadjian v. Caride*, No. CV 18-16381 (FLW), 2019 WL 6975102, at *8 (dismissing the plaintiffs' claims against the

Commissioner of the Department of Banking and Insurance based on the doctrine of quasi-judicial immunity); *Jodeco, Inc. v. Hann*, 674 F. Supp. 488, 498 (D.N.J. 1987) (dismissing claims against the mayor and zoning and planning boards of township); *see also Bass v. Attardi*, 868 F.2d 45, 49 (3d Cir. 1989). Here, Defendants are not alleged to be state actors. Moreover, *Bryan v. James E. Holmes Reg'l Med. Ctr.* – the lone-case Defendants cite not involving claims against a state actor – did not discuss quasi-judicial immunity at all. *See* 33 F.3d 1318, 1321 (11th Cir. 1994). Instead, that case dealt with an assertion of immunity under the Health Care Quality Improvement Act and Florida law. *Id.*

In sum, Defendants have failed to cite any authority indicating that quasi-judicial immunity protects the Hearing Panel, AHC, and Webb. Defendants admit as much. *See* Def. Reply at 3-4. Accordingly, the Court denies Defendants' motion to dismiss as to this argument.

### 3. Health Care Quality Improvement Act Immunity And New Jersey's Peer Review Statute

As to Defendants arguments addressing the litigation privilege and quasi-judicial immunity, Plaintiffs also point to the Health Care Quality Improvement Act, 42 U.S.C. § 11111 *et seq.* ("HCQIA"), and New Jersey's peer review statute, N.J.S.A. § 2A:84A–22.10. Pl. Opp. at 4 - 5. In addition, certain of the cases cited by Defendants in support of their motion review the HCQIA and the peer review statute.

In relevant part, the HCQIA provides as follows:

> (a) In general
> (1) Limitation on damages for professional review actions
> If a professional review action (as defined in section 11151(9) of this title) of a professional review body meets all the standards specified in section 11112(a) of this title, except as provided in subsection (b)--
> (A) the professional review body,
> (B) any person acting as a member or staff to the body,

> (C) any person under a contract or other formal agreement with the body, and
> (D) any person who participates with or assists the body with respect to the action,
> shall not be liable in damages[8] under any law of the United States or of any State (or political subdivision thereof) with respect to the action.

42 U.S.C. § 11111(a)(1).  However, to qualify for such protection, a professional review action must be undertaken in accordance with the following:

> (1) in the reasonable belief that the action was in the furtherance of quality health care,
> (2) after a reasonable effort to obtain the facts of the matter,
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a).

Under the HCQIA, a "professional review body" means "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity."  42 U.S.C. § 11151(11).  A "professional review action" is, in turn, defined as follows:

> [A]n action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or

---

[8] The HCQIA does not apply to injunctive and/or declaratory relief.  *Nahas v. Shore Med. Ctr.*, No. 19-3433, 2020 WL 5587698, -- Fed. App'x -- at *1 fn. 2 (3d Cir. Sept. 18, 2020) (citing *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 192 fn. 1 (3d Cir. 2005) ("The immunity provided by the HCQIA for persons engaging in the peer review process is limited to damages liability . . . Disciplined physicians may still maintain actions for injunctive or declaratory relief.")).

> membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.

42 U.S.C. § 11151(9).

The HCQIA further provides that "[a] professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section [42 U.S.C. §11111(a)] unless the presumption is rebutted by a preponderance of the evidence." 42 U.S.C. § 11112(a). To rebut the presumption, a plaintiff must show "that the defendant took action without a reasonable belief in initiating the action, failed to provide adequate notice and hearing procedures, or otherwise took action without a reasonable belief it was warranted by the facts after a reasonable investigation." *Hurwitz v. AHS Hosp. Corp.*, 438 N.J. Super. 269, 289 (App. Div. 2014) (citing 42 U.S.C. § 11112(a)).

New Jersey's peer review statute, N.J.S.A. § 2A:84A-22.10, is similar. *Hurwitz*, 438 N.J. Super. at 291 ("Like the federal law, the New Jersey statute provides broad immunity for damages to qualified persons for actions taken as part of a hospital's peer review process."). Relevant here, N.J.S.A. § 2A:84A-22.10 protects "[a]ny person who serves as a member of, is staff to, under a contract or other formal agreement with, participates with, or assists with respect to" a

> hospital peer-review committee having the responsibility for the review of the qualifications and credentials of physicians or dentists seeking appointment or reappointment to the medical or dental staff of a hospital, or of questions of the clinical or administrative competence of physicians or dentists so appointed, or of matters concerning limiting the scope of hospital privileges of physicians or dentists on the staff, or of matters concerning the dismissal or discharge of same.

N.J.S.A. § 2A:84A-22.10(d). Such persons "shall not be liable in damages" for their actions or recommendations made within the scope of their "function[s] with the committee . . . if such action

or recommendation was taken or made *without malice and in the reasonable belief after reasonable investigation that such action or recommendation was warranted upon the basis of facts disclosed*." N.J.S.A. § 2A:84A-22.10(2) (emphasis added); *see also Hurwitz*, 438 N.J. Super. at 291.

While it appears that both the HCQIA and the New Jersey peer review statute are applicable to the AHC, the Hearing Panel, and Webb the "question of whether Defendants are entitled to immunity from damages is an issue more appropriately determined at the summary judgment stage." *Nahas v. Shore Medical Center*, No. 13-6537 2016 WL 1029362 at *11 (D.N.J. 2016) (citing *Brader v. Allegheny General Hosp.*, 64 F.3d 869, 879 (3d Cir. 1995) (reversing district court's dismissal of claims based on HCQIA and stating that the HCQIA's presumption under 42 U.S.C. § 11112(a) "implies some opportunity to discover relevant evidence.")); *see also Bryan,* 33 F.3d at 1332-33 ("A district court should consider the issue of HCQIA immunity from damages at the summary judgment stage"). Instead, at the motion to dismiss stage, the Court evaluates whether, accepting Plaintiffs' allegations as true, Defendants would be entitled to immunity under the HCQIA or N.J.S.A. § 2A:84A-22.10(2). *Nahas*, No. 13-6537, 2016 WL 1029362 at *11.

Here, the Court finds that Plaintiffs have plausibly alleged that the AHC, the Hearing Panel, and Webb are not entitled to immunity under the HCQIA or New Jersey's peer review statute. As described above, Plaintiffs have alleged, among other things, that (1) Dr. Alexander received inadequate notice of the misconduct charges against him at both the AHC Hearing and the Article IX Hearing, FAC ¶¶ 122-123, *id*. ¶ 166; (2) the procedures in connection with the AHC Hearing and Article IX Hearing and procedural rulings by the AHC and Hearing Panel were unfair, *id*. ¶¶ 122-36, *id*. ¶¶ 176-196; and, (3) that the MEC initiated the peer review process without sufficient evidence to support the charges against Dr. Alexander and for the purpose of eliminating his

competition with the NYU Group, not in the furtherance of quality health care. *See e.g.*, *id.* ¶¶ 260, 404. These allegations are sufficient to defeat HCQIA immunity at the motion to dismiss stage. *Nahas*, No. 13-6537, 2016 WL 1029362 at *11 (refusing to dismiss claims based on HCQIA immunity where the plaintiff alleged, among other things, "he was subject to unfair internal review procedures"). For the same reasons, the Court finds that Plaintiffs have also sufficiently alleged that the Hearing Panel, AHC, and Webb did not act "without malice and in the reasonable belief after reasonable investigation" that their actions were warranted. *See* N.J.S.A. § 2A:84A–22.10; *see Nahas,* No. 13-6537, 2016 WL 1029362 at *11 ("Likewise, Plaintiff's allegations are sufficient to overcome Defendants' presumptive immunity under New Jersey's analog to the HCQIA, N.J.S.A. 2A:84A-22.10, which 'extends a similar form of immunity protection for hospitals, peer reviewers, and decision-makers,' because Plaintiff has sufficiently pleaded that Defendants acted out of malice rather than in the furtherance of health care."). To the extent that Defendants were relying on the HCQIA or the New Jersey peer review statute to support their motion to dismiss, the Court denies the motion.

### B. Defamation[9]

Defendants argue the defamation claims in the Complaint should be dismissed because "[t]he Complaint is deficient in terms of date, [and] identification of person to whom the statements were made." Def. Br. at 17-18. In response, Plaintiffs point to Dr. Kuenzler's January 2015 statement that Dr. Alexander committed "the crime of insurance fraud" (FAC ¶ 377) and Dr.

---

[9] The parties appear to agree that New Jersey law governs Plaintiffs' tort claims. *See* Def Br. at 22; *see also* Pl. Opp. at 29. Accordingly, for the reasons stated in note 6, the Court will apply New Jersey law.

Kuenzler's email to his co-Defendants in which he stated that Dr. Alexander was "driven only by his own-self-service, without regard for surgical standards," that Dr. Alexander was "erratic," and that he did not believe Dr. Alexander's practices "ha[d] a place in academic pediatric surgery at a true Children's Hospital." Def. Br. at 23-24; *see also* FAC ¶ 382. Defendants respond that because the statements forming the basis for the defamation claims occurred in 2015, Count Eight must be dismissed based on New Jersey's one-year statute of limitations for defamation claims. Def. Reply. at 6-7 (citing N.J.S.A. § 2A:14-3).

Turning to the timeliness issue, the statute of limitations is an affirmative defense which is not normally decided on a motion to dismiss. *See Crump v. Passaic County*, 147 F. Supp. 3d 249, 259 (D.N.J. 2015). However, "where the complaint facially shows noncompliance with the limitations period," dismissal on statute of limitations grounds may be appropriate. *Id*. In New Jersey, defamation claims "shall be commenced within 1 year next after the publication of the alleged libel or slander." N.J.S.A. 2A:14-3; *see also O'Donnell v. Simon*, 362 F. App'x 300, 305 (3d Cir. 2010) (affirming district court's Rule 12(b)(6) dismissal of defamation claims and stating that "[i]n New Jersey, the 'discovery rule' cannot extend the limitations period for defamation claims." (citing *Lawrence v. Bauer Publ'g & Printing Ltd.,* 78 N.J. 371 (1979)).

Here, according to the express allegations in the FAC, Dr. Kuenzler's alleged defamatory statement occurred in January 2015. FAC ¶ 377. Thus, N.J.S.A. § 2A:14-3 required Plaintiffs to bring their defamation claim by January 2016, but their Complaint was filed on September 24, 2019. D.E. 1. Accordingly, Plaintiffs defamation claim arising out of Dr. Kuenzler's January 2015 statement that Dr. Alexander committed "the crime of insurance fraud," FAC ¶ 377, is dismissed because it is time-barred. Nonetheless, the Court dismisses Plaintiffs' defamation claim

based on these statements without prejudice because it is not clear whether Plaintiffs intend to argue that some form of tolling applies.

Turning to the plausibility argument, Plaintiffs have failed to plead a claim for defamation arising out of Dr. Kuenzler's email to his co-Defendants.  FAC ¶ 508.  To plead defamation, Dr. Alexander must allege (1) that a false statement was made concerning him; (2) that the statement was published to a third party and not otherwise privileged; (3) that the publisher was at least negligent in publishing the statement; and (4) damages.  *Robles v. U.S. Environmental Universal Services, Inc.*, 469 Fed. Appx. 104, 109 (3d Cir. 2012) (citing *DeAngelis v. Hill,* 180 N.J. 1 (2004)).  Under New Jersey law, in a "complaint charging defamation, plaintiff must plead facts sufficient to identify the defamatory words, their utterer and the fact of their publication."  *Zoneraich v. Overlook Hosp.*, 212 N.J. Super. 83, 101 (App. Div. 1986).  A vague conclusory allegation is insufficient to plausibly plead defamation.  *Id*.

Here, the Complaint alleges that Dr. Kuenzler wrote to Defendants Dr. Carol Barsky and Dr. Karpeh that Dr. Alexander was "driven only by his own-self-service, without regard for surgical standards," that Dr. Alexander was "erratic," and that he did not believe Dr. Alexander's practices "ha[d] a place in academic pediatric surgery at a true Children's Hospital."  Def. Br. at 23-24; FAC ¶ 508.  Even though Plaintiffs do identify the recipients of the alleged defamatory statements – Dr. Barsky and Dr. Karpeh – Plaintiffs still "do[] not plausibly allege when[10] . . . the

---

[10] Plaintiffs attempted to supplement the allegations in the FAC through their Opposition, clarifying that the email response containing Dr. Kuenzler's alleged defamatory statements to Dr. Barsky and Dr. Karpeh "was dated December 19, 2015."  Pl. Opp. at 24.  Putting aside that this allegation seems to make the claim time barred, the Court cannot consider the allegation because "a complaint cannot be amended (or supplemented) by way of an opposition brief."  *Swift v. Pandey*, No. CIV.A. 13-649 JLL, 2013 WL 6022093, at *2 (D.N.J. Nov. 13, 2013) (citing *Pennsylvania ex rel. v. Zimmerman v. Pepsico,* 836 F.2d 173 (3d Cir.1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.")).

statement was made" and "fail[] to allege that the statement was not privileged." *See Chun v. Sushi Maru Express Corp.*, No. CV 17-6411, 2018 WL 3158815, at *5 (D.N.J. June 28, 2018) (citing *Robles v. U.S. Envtl. Universal Servs., Inc.*, 469 F. App'x 104, 109 (3d Cir. 2012)). Therefore, the Court finds that Plaintiffs have not sufficiently alleged a defamation claim as to Dr. Kuenzler.

Count Eight is dismissed without prejudice.

### C.  Trade Libel

Defendants seek dismissal of Plaintiffs' trade libel claims that are based on the reports (the "Reports") HUMC made to the New Jersey Division of Consumer Affairs ("DCA") and the National Practitioner Data Bank ("NPDB") concerning HUMC's summary and final suspensions of Dr. Alexander's clinical privileges at the Hospitals.  Def. Br. at 20-29.  Defendants submit that portions of New Jersey's Cullen Act, N.J.S.A. § 26:2H-12.2b(g), § 26:2H-12.2c(c), as well as portions of HCQIA, 42 U.S.C. 11137(c), immunized the Defendants in making the Reports.  *Id.* Plaintiffs counter that the Cullen Act and the HCQIA do not immunize false or malicious reporting and maintain that Plaintiffs' FAC contains allegations from which the Court can conclude that the Reports were false, and that Defendants knew they were false.  Pl. Opp. at 30.

In part, the Cullen Act obligates a "health care entity"[11] to notify DCA about certain actions it takes regarding a "health care professional"[12] who "has privileges granted by . . . or who provides

---

[11] In the act, "health care entity" means a "facility or institution, whether public or private, that is engaged principally in providing services for health maintenance organizations, diagnosis, or treatment of human disease, pain, injury, deformity, or physical condition[.]" N.J.S.A. § 26:2H-12.2b(i).

[12] In the act, "health care professional" includes a "person licensed or otherwise authorized . . . to practice a health care profession that is regulated by the Director of the Division of Consumer Affairs or by one of the following boards: the State Board of Medical Examiners[.]"  N.J.S.A. § 26:2H-12.2b(i).

. . . services pursuant to an agreement with a health care services firm or staffing registry" to the "health care entity." *See generally* N.J.S.A. § 26:2H-12.2b.  Relevant here, the Cullen Act obligates a "health care entity" to notify DCA if, "for reasons relating to the health care professional's impairment, incompetency, or professional misconduct, which incompetency or professional misconduct relates adversely to patient care or safety," a "health care professional . . . has full or partial privileges summarily or temporarily revoked or suspended, or permanently reduced, suspended, or revoked" or "[is] discharged from the staff" at the "health care entity." N.J.S.A. § 26:2H-12.2b(a)(1).  A "health care entity" that fails to provide the requisite notice to DCA "shall be" subject to penalty.  N.J.S.A. § 26:2H-12.2b(f).  If a "health care entity" provides a mandatory report to DCA or other authorized agency "in good faith and without malice" about a "health care professional," the entity "is not liable for civil damages in any cause of action arising out of the provision or reporting of the information."  N.J.S.A. § 26:2H-12.2b(g).

The HCQIA also imposes obligations like those under the Cullen Act.  In relevant part, the HCQIA obligates "health care entities"[13] to report "a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days" to the relevant state Board of Medical Examiners and to the Secretary of Health and Human Services.  42 U.S.C. §§ 11133(a)(1), 11134(b).  A "health care entity" that fails to meet those reporting requirements is subject to sanctions.  42 U.S.C. § 11133(c)(1).  And, as under the Cullen Act, the HCQIA includes an immunity provision:  "No person or entity . . . shall be held liable in any civil action with respect

---

[13] Under the HCQIA, "health care entity" includes a "hospital that is licensed to provide health care services by the State in which it is located, . . . an entity . . . that provides health care services and that follows a formal peer review process for the purpose of furthering quality health care[.]" 42 U.S.C.A. § 11151(4)(A).

to any report made under this subchapter . . . without knowledge of the falsity of the information contained in the report."  42 U.S.C. § 11137(c).

Defendants opine that because the Reports are true – *i.e.*, accurately reflect the basis for HMH's suspension and termination decisions – they are entitled immunity under the Cullen Act and the HCQIA and Plaintiffs' trade libel claim should be dismissed.  Def. Br. at 26-29; Def. Reply at 10.  However, the FAC plausibly alleges that the immunity provisions of both the Cullen Act and the HCQIA are not met.  As discussed, the HCQIA provides immunity where a health care entity issues a report pursuant to the HCQIA and "is without knowledge of the falsity of the information contained in the report."  42 U.S.C. § 11137(c); *Pal v. Jersey City Med. Ctr.*, 658 F. App'x 68, 75 (3d Cir. 2016) ("The only circumstance in which [42 U.S.C. § 11137(c)] immunity is not triggered is when (1) the report contains false information and (2) the individual or entity submitting the report knew that the information was false.").  The relevant Third Circuit decisions that reference Section 11137(c) immunity under the HCQIA do not address the standard governing Section 11137(c) immunity at the motion to dismiss stage.  *See Pal*, 658 F. App'x at 75; *Zheng v. Quest Diagnostics, Inc.*, 248 F. App'x 416, 421 fn. 10 (3d Cir. 2007).  In other circuits, "a general consensus has emerged that 'courts do not evaluate whether the underlying merits of the reported action were properly determined' but instead 'evaluate whether the report itself accurately reflected the action taken.'"  *Robinson v. E. Carolina Univ.*, 329 F. Supp. 3d 156, 177 (E.D.N.C. 2018) (collecting cases) (citation omitted).

In *Robinson*, the plaintiff asserted a claim for defamation based on the defendant insurer's submission of a report to the NPDB that the plaintiff contended was inaccurate.  *Id*. at 167-69.  The court granted the defendant insurer's motion to dismiss the plaintiff's claim based on immunity under Section 11137(c).  *Id*. at 178.  The *Robinson* court reasoned that the "plaintiff's complaint

d[id] not allege the report contain[ed] false information, only that the information provided rests on a faulty investigation." *Id*. at 177.  The district judge continued that the plaintiff had failed to challenge the accuracy of the report, and instead merely scrutinized "the underlying determination" made by the insurer. *Id*. at 178.  The court in *Robinson* concluded that "[b]ecause the report submitted to the NPDB accurately summarized the leadership team's decision . . . plaintiff has failed to allege defendant . . . knowingly submitted a false report." *Id*.  This case is distinguishable from *Robinson*, the cases it relied on, and the cases Defendants cite.

The decisions on which Defendants rely are summary judgment decisions or appeals from summary judgment decisions.  *See Davis v. Methodist Hosp.*, 997 S.W.2d 788, 790 (Tex. App. 1999) ("We address whether the trial court erred by granting summary judgment[.]"); *See also Lee v. Hosp. Auth. of Colquitt Cty.*, 353 F. Supp. 2d 1255, 1256 (M.D. Ga. 2004).  In comparison, this matter is at the motion to dismiss stage.  Moreover, those cases do not suggest that Section 11137(c) prevents a plaintiff from attempting to prove that a health care entity did not actually reach the conclusions reported to the NPDB, as Plaintiffs allege here.  FAC ¶¶ 159-60; *id*. ¶ 300.  Indeed, in *Davis*, the trial court permitted the plaintiff to adduce evidence that the defendant hospital's reported reason for his suspension was pretextual.  *Id*. at 795.  ("[Plaintiff] relied on affidavits . . . [that] stated . . . no finding of incompetence, negligence, or malpractice was ever made. [Plaintiff] also relied on an affidavit from one of the Peer Review Committee members, who stated the Peer Review Committee did not find that Dr. Davis was negligent, incompetent, or guilty of malpractice.")  The Court will afford Plaintiffs the same opportunity here.

The decision to permit Plaintiffs' trade libel claim to proceed past a motion to dismiss is in accord with the court's determination in *Elkharwily v. Franciscan Health Sys.  See* No. 3:15-CV-05579-RJB, 2015 WL 7758550, at *1 (W.D. Wash. Dec. 1, 2015).  In *Elkharwily*, the plaintiff

alleged that the defendant hospitals denied the plaintiff's application for clinical privileges and revoked the plaintiff's temporary privileges based on the plaintiff's "national origin, creed, race, color, and bipolar mental health status."  *Id*.  In denying plaintiff's application for clinical privileges, the defendant hospitals reported that the plaintiff had "failed to demonstrate the scope and adequacy of his experience or his current clinical skill and competence" to the NPDB.  *Id*.  The plaintiff asserted a defamation claim based on the report and alleged that the defendants' report to the NPDB was false because all the information in the defendants' possession "demonstrated only that [p]laintiff was competent."  *Id*.  Defendants moved to dismiss the defamation claim under 42 U.S.C. § 11137(c).  *Id*. at *2.  The court in *Elkharwily* denied the motion to dismiss, finding that the defamation claim survived the "immunity defense raised by defendants."  *Id*.  The district court reasoned that "[a]ssuming that defendant possessed only the documentation alleged (e.g. – reports from coworkers declaring Plaintiff's competence), a reasonable inference could be made that Defendant had knowledge that the submitted report was 'false,' because the documents did not substantiate the conclusions in the report."  *Id*.

Here, Plaintiffs similarly allege that the bases provided in the Reports to the NPDB and DCA were pretextual.  *See* FAC ¶ 300.  Plaintiffs allege that the bases for termination provided in the Reports – that Dr. Alexander exhibited "substandard or inadequate care" and "professional misconduct which relates adversely to patient safety," *see id*. ¶ 533, – were false.  *See id*. ¶¶ 532, 533.  Plaintiffs further allege that HMH knew the information in the Reports was false, *id*. ¶¶ 533, and that the real reason HMH terminated Dr. Alexander's privileges was to eliminate his competition with the NYU Group and ruin Plaintiffs' business.  *See e.g.*, *id*. ¶¶ A, 404, 409.  Putting forward more support for this theory, Plaintiffs allege that the Appellate Panel effectively exonerated Dr. Alexander from each of the MEC's charges.  *Id*. ¶ 241-57.  Plaintiffs further allege

that, despite the Appellate Panel's findings, the Executive Committee circumvented normal procedures and suspended Dr. Alexander based on the new Falsification Charges without affording Dr. Alexander the benefit of the multiple hearings ordinarily required under the Bylaws.  *Id.* ¶¶ 262-93; *id.* ¶ 300.  These allegations support a reasonable inference that the Reports contain pretextual – *i.e.*, false – justifications for HMH's termination of Dr. Alexander's clinical privileges and that HMH knew such justifications were pretextual.   Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' trade libel claims based on the HCQIA's reporting immunity.  Moreover, based on the same allegations, the Court finds that a reasonable inference can be made that the Reports were not made "in good faith and without malice" such that the Court will also deny Defendants' motion to dismiss Plaintiffs' trade libel claims based on the Cullen Act's reporting immunity.

## V.       CONCLUSION

Defendants' motion to dismiss, D.E. 8, is granted in part and denied in part.  Defendants' motion is denied except for its motion as to defamation under Count Eight.  Count Eight is dismissed without prejudice, and Plaintiffs have thirty (30) days to file an amended complaint that cures the deficiencies noted herein.  If Plaintiffs fail to file an amended complaint within the time allotted, the Count Eight will be dismissed with prejudice.  An appropriate Order accompanies this Opinion.

Dated: September 29, 2020

_____
John Michael Vazquez, U.S.D.J.